STATE OF CONNECTICUT *v.* ROBBIE
TERELL SANTOS
(AC 26700)

Flynn, C. J., and McLachlan and Lavine, Js.

600

Argued May 31—officially released December 4, 2007

*Richard Emanuel,* special public defender, with whom was *Brian S. Carlow,* deputy chief public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom were *Russell C. Zentner,* senior assistant state's attorney, and, on the brief, *Timothy J. Liston,* state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Robbie Terell Santos, appeals from the judgment of conviction, following a trial to the court, of attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a) (2).[1] On appeal, the defendant claims that the court improperly (1) determined that there was sufficient evidence to support the conviction, (2) denied his motion to suppress three pretrial identifications and (3) rendered findings of guilt that were legally and factually inconsistent. We affirm the judgment of the trial court.

The court reasonably could have found the following relevant facts. On May 21, 2003, at 5:30 p.m., Derek Hopson, a clinical psychologist, finished his work for the day and left his office at the Middlesex Hospital Center for Behavioral Health (center) in Middletown.

---

[1] The defendant was found not guilty of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2), carrying a pistol without a permit in violation of General Statutes § 29-35 and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On May 23, 2005, the court sentenced the defendant to thirteen years imprisonment on the attempt to commit murder conviction and to a five year consecutive term pursuant to the sentence enhancement provisions of General Statutes § 53-202k, for a total effective sentence of eighteen years imprisonment.

Hopson walked out of the rear door of the center with a coworker, Christine Brown, and they proceeded into the parking lot. Brown got into her car, which was in the first section of the parking lot, and drove alongside Hopson, continuing to chat with Hopson as he walked to the second section of the parking lot where his car was located. Hopson and Brown left the office together for their safety because approximately six or seven months prior, Hopson had been assaulted in the parking lot by three men.

Upon reaching Hopson's car, they observed the defendant, who they both described as a black man wearing a dark hooded sweatshirt,[2] walking toward them very quickly. When the defendant was approximately twenty feet away from them, he called out to Hopson, asking him for spare change. Hopson told the defendant that he did not have any change. The defendant continued to approach Hopson and when he was about ten feet away, the defendant asked Hopson again for change, pulled back his hood and began rushing toward Hopson's car.

Hopson testified that upon the defendant's second request for change, he "locked eyes" very intensely with the defendant and told the defendant again that he did not have any change, but the defendant continued toward him. Hopson unlocked his car door, leaped into his car and slammed the door shut as the defendant reached the driver's side of his car. Hopson saw the defendant smirk as he stepped back with a silver or gray gun in his hand. The defendant fired one gunshot at Hopson through the front driver's side window of Hopson's car, shattering the window but missing Hopson.[3] Hopson, who thought he had been shot, pressed

---

[2] Hopson described the hooded sweatshirt as dark charcoal gray or black in color, and Brown described it as gray.

[3] During their investigation, the police recovered a bullet fragment inside Hopson's car on the floor mat in the driver's side area. They also recovered a shell casing and a live round on the ground near the car.

down on his car horn, hoping to attract attention, and the defendant turned and ran initially toward Brown's car and then ran out through the parking lot entranceway from which he came.

According to Brown's recounting of the events at trial, she could not hear what had transpired between the defendant and Hopson prior to the shooting because she had rolled up her car windows. The situation appeared strange to her, however, so she pulled her cellular telephone out as the defendant approached. After pulling out her telephone, Brown observed the defendant with a small silver or gray gun fire the gunshot at Hopson through the driver's side window of Hopson's car. As the defendant ran out of the parking lot onto Hubbard Street, Brown pursued him initially in her car, following him across Hubbard Street and turning about a car length onto the adjoining street, Goodyear Avenue. Deciding that such a course of action was unsafe for her, she then backed up into Hubbard Street and dialed 911 on her cellular telephone. Brown estimated that about ten to twenty seconds had elapsed between the time that the shooting occurred and when she dialed 911.

Middletown police department 911 dispatcher Maria Hanlon recorded that Brown's 911 call was logged at 5:35:48 p.m.[4] Brown explained to Hanlon what had happened and told her that this was not the first time that Hopson had been assaulted in the parking lot. While Brown was on the telephone with Hanlon, Hopson got out of his car and into Brown's car and also called 911 on his cellular telephone. As they both were on the telephone, two witnesses, Michael Shepherd and his

---

[4] Hanlon testified that there could be a one or two minute discrepancy between when the call actually was made and this recorded time, depending on how the information is gathered. She was uncertain whether such a discrepancy existed in this case but guessed that such a delay might be about one minute.

son, approached Brown's car, indicating that they had seen the perpetrator flee the scene and assisted Brown in advising Hanlon about the defendant's potential whereabouts.

Shepherd, who lived nearby on Goodyear Avenue, testified that just prior to the shooting, he had been at his house with his son and a couple, Todd Burke and April Francks. He was in the process of selling his truck to Burke and Francks. At that time, Shepherd observed a black male wearing a black hooded sweatshirt, white or gray sweatpants and white sneakers walk by his house heading toward the parking lot where the shooting occurred. Approximately fifteen to twenty minutes after observing this black male, Shepherd heard a gunshot and then saw the same black male running back up Goodyear Avenue with a handgun and attempting to conceal the handgun in his clothing. Shepherd's account was corroborated by the testimony of Francks.

Another witness, Alissa Kindschi, testified that she saw the perpetrator both before and after the shooting. Kindschi was at her home, which is located on Hubbard Street adjacent to the center parking lot, with her daughter and her son. Kindschi and her daughter walked out to their driveway and observed a black man with a dark colored, hooded sweatshirt standing alongside the shrubs near the center parking lot. It appeared to Kindschi that the man was looking into the center parking lot. According to Kindschi, her daughter spoke, which caused the defendant to turn and look at them from a distance of approximately ten to twenty feet. Kindschi then went into her house and continued to watch the man for another five to ten minutes. During this time, she noted that the man was wearing black nylon wind pants and black Nike sneakers. At some point, Kindschi went to get her son a bottle and when she came back, she looked out the window and the man was no longer there. Kindschi testified that as she

was watching the five o'clock news on television, she heard what sounded like a firecracker two or three times, followed by the sound of a car horn beeping. She looked out her window onto Hubbard Street and this time observed Brown outside of her car on the telephone and Hopson inside Brown's car.

Emergency 911 dispatch records indicated that the first police officer to arrive on the scene was Biagio Vinci, who arrived at 5:37:29 p.m. A second officer, Vincent Mazzotta, a K-9 handler, arrived at 5:38 p.m., with his German shepherd, Dago.[5] Upon arrival, Mazzotta assessed the situation and prepared Dago to track the suspect.[6]

Consistent with witness testimony about the direction in which the suspect fled, Dago began tracking the scent across Hubbard Street and down Goodyear Avenue. During the tracking, Mazzotta was joined by another police officer, James Prokop, who arrived to provide backup. Although their tracking path was not

[5] Mazzotta testified that he received specialized training and was certified as a K-9 handler through the state police in July, 2001. Dago went through this training and certification process with Mazzotta, and they both had been recertified on a biannual basis and performed successfully monthly in-service trainings since July, 2001. Part of Mazzotta's responsibilities with Dago was tracking suspects who fled on foot.

[6] At trial, Mazzotta explained this process: "The dog is trained to have a harness during the tracking period and . . . at the time of putting the harness on, the dog realizes it's going to track and we entice the dog by getting him all excited . . . put him into a tracking mode. . . .

"We . . . get him excited by rubbing . . . his head, rubbing his belly, telling him we're going to go work, getting the . . . high-pitched voice, this way the dog gets motivated and . . . can jumble out of extra attention at that moment, prior to doing, doing the track. . . .

"[After this process], I attach a fifteen foot leash to him, and then I bring him to the area that I was pointed to where the suspect was last seen, the person who had shot the gun was last seen, and I give him a 'find him' command. It's a sharp, loud 'find him' and then I [do] . . . what we call casting, allow him to smell around and look for a strong scent of someone that would have the scent of apocrine or BASE would be falling from their skin and he'd pick up that odor and track that odor."

linear,[7] Dago tracked the scent eventually to a low-rise apartment building, which was part of Wesleyan University, where the officers saw the defendant, who was wearing a gray sweatshirt type of jersey with black wind pants. The officers ordered the defendant to the ground. In accordance with his training, Dago identified the defendant as the source of the scent by putting his paws on the defendant's back. The defendant was apprehended approximately three-tenths of one mile from the parking lot where the shooting occurred.

Another witness, Stefan Wasilewski, testified that he had contact with the defendant just prior to the defendant's apprehension. Wasilewski, who was a Wesleyan University student at the time, testified that sometime around 5:30 p.m., on the date of the shooting, he and a friend were leaving the low-rise apartment building where his apartment was located, when a thin black male, who appeared flustered, approached them and requested to use his telephone. Wasilewski went back into his apartment and retrieved his cellular telephone and permitted the defendant to use it.[8] According to Wasilewski, the defendant made several telephone calls and Wasilewski heard the defendant requesting a ride. Wasilewski's telephone records indicated that the defendant made his first call to Waterbury on Wasilewski's telephone at 5:38 p.m. and his last call at 5:42 p.m. Upon completing the calls, the defendant began to walk down the street toward Guiseppe's restaurant,

---

[7] Mazzotta testified that Dago made a circle at the corner of Hotchkiss and Church Streets in order to pick up the scent, before heading in a northerly direction. At the suppression hearing, Prokop testified that Dago led them past Guiseppe's restaurant on Church Street and then turned around, heading toward the defendant. Prokop testified that this about-face corresponded with radio broadcasts from another officer informing Mazzotta and Prokop that the suspect was straight ahead.

[8] Wasilewski estimated that three to five minutes elapsed between his initial contact with the defendant and when the defendant made his first telephone call.

at which time Wasilewski observed the police arrest the defendant.

After the defendant was arrested, the police took him to a location on Williams Street, which was just around the block from the center parking lot where the shooting occurred. The defendant was present with Dago and several officers, including Mazzotta. At this location, the police conducted a series of show-up identifications with three eyewitnesses, Hopson, Brown and Kindschi. Separately, each witness was driven slowly by the defendant as he stood on the side of the street. Each of the witnesses identified the defendant as the perpetrator.

After this process, the police arrested the defendant and took him to the police station for booking. The defendant was advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and his hands were tested for gunshot residue using a kit. The laboratory results of the gunshot residue tests indicated the presence of a particle of lead on the defendant's right hand.[9]

For several hours after the defendant was apprehended, Dago and the police, including Mazzotta, conducted an extensive search of the neighborhood, looking for additional evidence such as a discarded handgun and clothing. Despite this extensive search, no gun was recovered at that time.

[9] Virginia M. Maxwell, a criminalist with the state forensic science laboratory, testified that the three common elements of gunshot residue are lead, antimony and barium. She further testified that, like chalk dust, gunshot residue can be wiped away. Jack Hubball, a criminalist also with the state forensic science laboratory, testified that to the extent that there was neither antimony nor barium detected, the test results simply indicated that a component of gunshot residue had been detected. He further testified that there is an expectation that gunshot residue particles would be spherical and that in addition to the fact that neither antimony nor barium were found on the defendant's hands, the detected lead particle was not spherical in shape.

One week later, in the morning on May 28, 2003, a landscaper, Matthew Gilbert, was mowing a lawn near a rest home located on Church Street, which was between the place of the shooting and where the defendant was apprehended. Gilbert testified that the lawn was last mowed on May 21, 2003, prior to the shooting. As Gilbert mowed a grass median, he observed a piece of cloth, which he had to move to continue mowing. Underneath the cloth, Gilbert found a .25 caliber handgun. Gilbert picked up the gun and observed a bullet lodged in its chamber. He alerted nearby maintenance workers and the police were contacted.

Middletown police Officers Scott Aresco and David Godwin arrived and recovered the gun. Upon inspection, they discovered that the gun had a round protruding from the magazine into the chamber, which would cause the gun to jam. The police removed the bullets from the gun to make it safe before securing it as evidence. At the scene, the police also recovered a small hat.[10] A hooded sweatshirt was never recovered.

The state also presented testimony from Christopher Proctor, a correction officer from the Hartford Correctional Center. Proctor testified that while the defendant was being held in custody, the defendant confessed to Proctor that he had committed the crimes charged.[11] Specifically, the defendant told Proctor that a man had approached him and offered him $8000 to kill a doctor

---

[10] Laboratory tests revealed that the hat contained two Caucasian head hair fragments that were unsuitable for comparison.

[11] In addition, the state presented testimony from a jailhouse informant, Mason Marconi, who claimed that the defendant confessed to him while in jail. The veracity of Marconi's testimony and his credibility at trial was called into question by the court in a later proceeding. Further, the state presented consciousness of guilt evidence that the defendant made purported inculpatory statements in a telephone call from the jail to his aunt. At the suppression hearing, however, the court noted that an ambiguity existed with respect to the meaning of these statements.

in Middletown. The man gave the defendant a description of Hopson and the center, explained the time and location that Hopson would leave work and arranged a getaway car for the defendant.

According to Proctor, the defendant stated that on the date of the shooting, the man dropped the defendant off, and the defendant waited for Hopson to emerge from the center. As Hopson left the building, the defendant approached him and fired two to three gunshots at him before the gun jammed. The defendant then fled the scene, but there was no getaway vehicle, so he threw the gun between two buildings and started talking with numerous females before he was apprehended by the police. Proctor admitted that he did not report the defendant's confession to anyone until months later when he mentioned it to a Middletown police detective.[12]

At trial, the defense called the defendant to testify on his own behalf. The defendant testified that in May, 2003, he had a fifteen to sixteen year drug habit and that he used marijuana, cocaine, crack cocaine and pills. The defendant explained that he often sold drugs and engaged in "hustling on the street" in order to support his illegal drug habit. The defendant had a lengthy criminal history, with eleven prior felony convictions, including burglary, attempted larceny and assault on a police officer. The defendant testified that he has been asthmatic since he was a child, which makes it difficult for him to engage in physical activity without suffering an asthma attack.

According to the defendant, on May 21, 2003, he was out on the streets of Waterbury "getting high [on drugs], selling drugs [and] hanging out." At some point, he was approached by two women whom he had known from

---

[12] Proctor explained that he did not report the confession earlier because he had dismissed the story initially as being far-fetched.

previous drug transactions. The women produced $80 and requested that the defendant acquire some marijuana and crack cocaine for them, which the defendant did. After selling the drugs to them, the defendant requested that the women allow him to go with them so that they could "party together," and the women agreed, allowing the defendant into the back of their car. After driving around and getting high for more than an hour, the defendant got into a dispute with the women because he had lied to them about having money to purchase more drugs and had retained some of the crack cocaine, which he had promised to them. The women ejected the defendant from the car.

The defendant, who was now in Middletown, waited for them to return. After approximately forty-five minutes, the defendant went into Giuseppe's restaurant and asked to use the telephone. After being denied this request, the defendant left Giuseppe's restaurant and walked down the street to the low-rise apartment buildings, where he encountered Wasilewski, who allowed the defendant to use his telephone. The defendant called his house and spoke to his stepfather, in an attempt to reach his cousin. After his efforts to reach his cousin by telephone were unsuccessful, the defendant observed the police coming toward him, and he was promptly arrested. The defendant denied any involvement in the attempted murder of Hopson.

On July 20, 2005, the court rendered judgment finding the defendant guilty on the charge of attempt to commit murder and not guilty on the remaining charges.[13] The court's judgment of guilty was rendered on the basis of the witness identifications, including that made by

---

[13] Just prior to rendering its decision, the court stated, "I have to say that I struggled with this decision. I hope and pray that it is the correct one." The court then found the defendant guilty of attempt to commit murder beyond a reasonable doubt and acquitted him on the remaining charges.

Dago, and the statements of the defendant. This appeal followed.

I

The defendant first claims that the state failed to present sufficient evidence for the court to conclude beyond a reasonable doubt that he attempted to murder Hopson. Specifically, the defendant contends that the state presented unreliable identification evidence, including unreliable canine tracking evidence, and that there was insufficient forensic evidence linking the defendant to the crime. Further, the defendant contends that the state's theory of the case, placing him approximately one third of one mile away from the crime scene just minutes after the shooting, belies logic and common sense.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant

guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

The defendant's sufficiency claim is premised on his theory of the case that he was not the shooter and that the police jumped to conclusions, erroneously arresting the wrong man. Essentially, this claim comprises a three-pronged attack on (1) the reliability of the eyewitness identifications, (2) the reliability of the K-9 unit identification and the lack of physical evidence pointing

to the defendant and (3) the state's theory, which placed the defendant one third of one mile from the crime scene in the circumstances in which he was found, just a short time after the shooting.

With respect to the reliability of the pretrial eyewitness identifications made by Hopson, Brown and Kindschi, as we conclude in part II, this evidence was sufficiently reliable to support its admissibility at trial. In evaluating this evidence in the context of the defendant's sufficiency claim,[14] the court reasonably could have concluded that this evidence was a compelling component in the court's determination that the defendant was the shooter. Each of the three witnesses had ample opportunity to view the defendant in daylight hours. Kindschi observed the defendant, from a distance of ten to twenty feet, turn and look at her as she stood in her driveway, and she then went into her house and continued to watch him for another five to ten minutes. Hopson, who positively identified the defendant in court, testified that just prior to the shooting, he "locked eyes" very intensely with the defendant and observed the defendant smirk as he fired the gunshot. Similarly, Brown was only a short distance away as she observed the defendant enter the parking lot and fire the gunshot. During the show-up identification, each of these witnesses unequivocally identified the defendant as the perpetrator.

With respect to the reliability of Dago's identification and the lack of physical evidence pointing to the defendant, the defendant's argument contains only the conclusory assertion that this case "presents unreliable dog tracking evidence" and notes that there was no forensic evidence linking the defendant to the crime, cursorily

[14] See *State* v. *Calabrese*, 279 Conn. 393, 401–402, 902 A.2d 1044 (2006) ("[c]laims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error" [internal quotation marks omitted]).

directing us to the facts presented at trial. While the facts presented by the defense, e.g., radio transmissions that support the inference that the K-9 unit was redirected toward the defendant and evidence of lead on the defendant's hand that was arguably inconsistent with gunshot residue, bolster the defendant's theory of innocence, it is not the province of this court to determine whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. Rather, we must determine whether there is a reasonable view of the evidence that supports the court's judgment of guilty. See *State* v. *Ledbetter*, supra, 275 Conn. 543. On the basis of the evidence presented at trial, the court reasonably could have relied on Mazzotta's testimony that Dago identified the defendant[15] and the expert testimony that a component of gunshot residue had been detected on the defendant's hand to support its conclusion.

Similarly, the defendant's meticulous presentation of the chronology of the events between the time of the shooting and his apprehension merely supports the notion that there *may* be a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We disagree with the defendant that the chronology evidence made it impossible or even unreasonable for the court to conclude that the defendant was the shooter. In construing the evidence presented at trial in the light most favorable to sustaining the judgment, it cannot be disputed that Brown's 911 call,

---

[15] The defendant neither objected to this testimony at trial nor raised on appeal the admissibility of this testimony for lack of foundation. See *State* v. *Wilson*, 180 Conn. 481, 488–90, 429 A.2d 931 (1980) (concluding that testimony of state trooper describing work with bloodhound to track and apprehend suspect admissible as expert testimony after proper foundation laid); see also *State* v. *St. John*, 282 Conn. 260, 272, 919 A.2d 452 (2007) (dog handler competent to present dog tracking evidence as expert in matter, provided proper foundation has been established).

which was admitted as a full exhibit at trial, demonstrates that approximately six minutes elapsed between the time that Brown initiated the call and the time that she reported on the tape recording that the first officer arrived. Further, 911 dispatch records indicated that the first police officer to arrive on the scene was Vinci, who arrived at 5:37:29 p.m. Thus, the court reasonably could have drawn the inference that at least *seven minutes* elapsed between the time of the shooting and the time that the defendant made the first telephone call on Wasilewski's telephone at 5:38 p.m., which would have given the defendant ample time to cover one third of one mile, enter Giuseppe's restaurant and discard evidence along the way.[16] The defense presented evidence at trial that a fifty-two year old, 230 pound male investigator was able to cover the distance at a "brisk jog" in less than two and one-half minutes.

The court indicated that in addition to the identification evidence, its finding of guilt was made on the basis of the defendant's statements. We agree that the statements provide a compelling piece of evidence in support of the defendant's guilt. In addition to the defendant's admissions to Proctor, the defendant testified at trial that at the time of the shooting, he was a liar, a drug addict and a street hustler. This evidence, as well as the

---

[16] Although it is undisputed that Brown's 911 call was logged by dispatch at 5:35:48 p.m., the 911 dispatcher testified that the call may have actually been made one to two minutes prior to this time. On the basis of the duration of the 911 call, it would not be unreasonable for the court to conclude that the call was actually made several minutes prior. Moreover, the defendant's theory of the time line does not create an impossibility. In his theory, the defendant concedes that it would not be unreasonable for the court to conclude that the shooting occurred at 5:33:28 p.m. Further, it is undisputed that the defendant made the first call from Wasilewski's telephone at 5:38 p.m., however, there was no evidence presented that would preclude the conclusion that the call was made at the tail end of 5:38 p.m. (i.e., 5:38:59 p.m.). Even if we assume arguendo that the defendant made contact with Wasilewski two minutes prior, this still would have allowed a three and one-half minute window for the defendant to cover the distance.

evidence of his prior convictions, including an assault conviction, supports a reasonable inference that the defendant had a motive and the capability to carry out the offense. On the basis of the evidence presented at trial, we cannot conclude that no reasonable view of the evidence exists that supports the court's findings.[17]

II

The defendant next claims that the court improperly denied his motion to suppress the pretrial identifications of him made by Hopson, Brown and Kindschi. The defendant argues that his state and federal constitutional rights to due process and a fair trial were violated because the identifications were unreliable.[18] We disagree.

Prior to trial, the court conducted a six day suppression hearing on the defendant's motion to suppress the three witness identifications of the defendant that occurred on Williams Street. The following additional facts, established at the suppression hearing, are relevant to our resolution of the defendant's claim.

After his apprehension, the police placed the defendant in the back of a cruiser on Williams Street and

[17] We do not import a lack of confidence in the court's statement that it struggled with its decision in rendering its finding of guilt; see footnote 13; as there is an equal inference that the court merely was reflecting on the gravity of its role as the trier of fact.

[18] Our courts have not distinguished the standard for admissibility of identification evidence under article first, § 8, of the constitution of Connecticut from the standard under the fourteenth amendment to the United States constitution. See *State* v. *Ledbetter*, supra, 275 Conn. 559. Thus, our courts have used the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), to determine whether an identification was deemed reliable under the federal constitution. *State* v. *Evans*, 44 Conn. App. 307, 318, 689 A.2d 494, cert. denied, 240 Conn. 924, 692 A.2d 819 (1997). Because the defendant has claimed no greater protection under the Connecticut constitution, the claim is properly considered under the federal constitution. See, e.g., *State* v. *Green*, 261 Conn. 653, 656 n.7, 804 A.2d 810 (2002).

had each of the three witnesses driven by individually in another cruiser to make the identification. Coordinating this show-up identification process by radio, the officers took the defendant out of the back of the cruiser and had him stand as a cruiser carrying each witness drove by him.

Hopson testified that just prior to the identification, the police told him that they wanted him to identify someone, and he was transported to the location. As he was driven by the defendant, Hopson noticed that the defendant's head was bowed down initially but that the defendant lifted his head, and Hopson was able to get a good look at the defendant's face. Immediately upon viewing the defendant's face, Hopson "knew emphatically" that the defendant was the person who shot at him.[19] Hopson also positively identified the defendant in court as the perpetrator.

Similarly, Brown testified that as she drove by, she immediately knew that the man standing on Williams Street was the perpetrator. She also was able to get a good look at the defendant's face to make the identification. With respect to the defendant's clothing, Brown testified that her focus was on the defendant's face and not his sweatshirt.

Kindschi testified that the police told her that they had apprehended someone who they believed was involved in the shooting and asked her to make an identification. Kindschi told the police that she could only identify the clothing and not the perpetrator's face. As she drove by the defendant, Kindschi testified that the defendant was standing handcuffed with his back

[19] At trial, Hopson testified that in his training and experience as a clinical psychologist, he is trained to focus on a person's facial features, movement and gait. He testified that this training played a role in his positive identification of the defendant and that he was absolutely certain that the defendant was the perpetrator.

facing her, flanked by police officers on both sides. She testified that there probably were more than two officers present with the defendant during the show-up. Kindschi testified that the cruiser in which she was riding stopped near the defendant and that she focused on his black wind pants and black sneakers. Kindschi was confident that the defendant was the same person she had seen earlier because of his pants and sneakers.

At the conclusion of the hearing, the court determined that the identifications were unnecessarily suggestive.[20] Nevertheless, the court determined that the identifications were reliable under the totality of the circumstances. Accordingly, the court denied the defendant's motion to suppress.[21]

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is

[20] Despite Kindschi's testimony that the defendant was handcuffed and flanked by officers during the show-up and that the police had told her that they believed that he was the perpetrator, and although the court noted that the police were certain at the time that they had the sole culprit, which militated against a finding that exigencies prohibited a photographic array, the state argues, ostensibly as an alternate ground for affirmance, that the court improperly determined that identification procedures were unnecessarily suggestive. Compare *State* v. *St. John*, 282 Conn. 260, 278, 919 A.2d 452 (2007) (court properly determined identification procedure not unnecessarily suggestive where, inter alia, police presence not overwhelming, it was unclear defendant was handcuffed and police did not suggest defendant was person who committed crime). Because the reliability of the identifications is dispositive of the claim, we need not address the merits of this argument.

[21] The defendant raises the issue that because the court found that the show-up procedure was unnecessarily suggestive, the identifications should be invalid per se. The defendant concedes, however, that because this issue has been resolved by our Supreme Court; see *State* v. *Ledbetter*, supra, 275 Conn. 570; this court is not the proper forum to raise this issue. We agree and therefore decline to review this claim.

two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 276–77, 919 A.2d 452 (2007).

"[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime, the [witness'] degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) Id., 279.

In determining that the identifications were reliable under the totality of the circumstances, the court

applied the relevant factors. First, the court found that each of the three witnesses had an ample and adequate opportunity to view the defendant at or near the time of the shooting. Second, the court found that all three witnesses paid a high degree of attention to the defendant. With respect to Hopson, the court noted that prior to the shooting, Hopson was approached closely by the defendant as the defendant requested money from him. Similarly, the court noted that prior to the shooting, Brown's "antennae . . . were up" because upon seeing the defendant approach Hopson, she grew immediately concerned, fearing a replay of the prior assault on Hopson in the parking lot. With respect to Kindschi, the court noted that her interest had been aroused and her attention was sufficient. Third, the court determined that, for the purposes of admissibility, the descriptions were sufficiently accurate to allow the identifications to be admitted. Although the court conceded that there were some inconsistencies, the court noted that the descriptions were all accurate as to the type and nature of the clothing[22] and the description of the defendant as a black male. Fourth, the court found that each of the witnesses was very certain that the defendant was the perpetrator. The court noted, in particular, Hopson's level of absolute certainty. Finally, the court found that the period between the shooting and the identifications, which was only thirty to thirty-five minutes, was a very brief period.

Our examination of the record reveals that the court's findings with respect to the show-up pretrial identifications by Hopson, Brown and Kindschi are amply supported. We therefore conclude that the court did not

---

[22] The defendant seeks to draw our attention particularly to slight inaccuracies and inconsistencies in the witnesses' description of the perpetrator's clothing. The court acknowledged that there were some inconsistencies, and we fail to see, in considering the totality of the circumstances, how these minor inconsistencies, without more, would form the linchpin of the analysis, especially in light of Kindschi's description that the perpetrator wore black wind pants and black sneakers, which the defendant was wearing upon his apprehension.

abuse its discretion in determining that the identifications were reliable under the totality of the circumstances. See *State* v. *St. John*, supra, 282 Conn. 280–81.

## III

The defendant's final claim is that the court improperly denied his postjudgment motions for a new trial or a judgment of acquittal in which he claimed that the court's judgment of conviction of attempt to commit murder was legally and factually inconsistent with the court's judgment of acquittal on the remaining charges. The defendant claims that these inconsistent findings denied him his right to due process and to a valid finding under the state and federal constitutions. Alternatively, the defendant seeks relief under our supervisory authority. See Practice Book § 60-2.

On August 6, 2004, the defendant filed a motion for a judgment of acquittal and a motion for entry of a judgment of not guilty or a new trial, in which he sought relief on the ground that the court, inter alia, rendered inconsistent findings. On February 8, 2005, the court issued a memorandum of decision denying these motions.[23] In its decision, the court rejected both the claimed legal and factual inconsistency arguments set forth by the defendant. The defendant now raises both claims on appeal.

## A

With respect to the claim of a legal inconsistency in the court's judgment, the defendant claims that the court improperly rendered judgment of conviction on the charge of attempt to commit murder in violation of §§ 53a-54 (a) and 53a-49 (a) (2) while simultaneously rendering judgment of acquittal on the charge of attempt to commit assault in the first degree in violation

---

[23] The court also denied various other posttrial motions filed by the defendant.

of §§ 53a-59 (a) (1) and 53a-49 (a) (2).[24] As such, the defendant argues that the court's denial of his postverdict motions was improper. We disagree.

"[W]here the inconsistent verdicts claim involves a simultaneous conviction and acquittal on different offenses, the court, in testing the verdict of guilty for inconsistency as a matter of law, is necessarily limited to an examination of the offense charged in the information and the verdict rendered thereon without regard to what evidence the [fact finder] had for consideration. . . . If the offenses charged contain different elements, then a conviction of one offense is not inconsistent on its face with an acquittal of the other." (Internal quotation marks omitted.) *State* v. *Knight*, 266 Conn. 658, 667, 835 A.2d 47 (2003). Because this claim presents a question of law, our review is plenary. See *State* v. *Mooney*, 61 Conn. App. 713, 719, 767 A.2d 770, cert. denied, 256 Conn. 905, 772 A.2d 598 (2001).

The second count of the information, which charged the defendant with attempt to commit murder, alleged in relevant part that the defendant, "with intent to cause the death of another person, namely: Derek Hopson, did attempt to cause death to such person by means of a deadly weapon, to wit: a .25 caliber pistol . . . ." The third count of the information, which charged the

---

[24] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

defendant with attempt to commit assault in the first degree, alleged in relevant part that the defendant, "with intent to cause serious physical injury of another person, namely: Derek Hopson, did attempt to cause serious physical injury to such person by means of a deadly weapon, to wit: a .25 caliber pistol . . . ."

In comparing the charged offenses for the purpose of determining the existence of a legal inconsistency, the defendant argues that although each offense requires a distinct conscious objective (i.e., a specific intent to commit murder versus a specific intent to commit serious bodily injury), our Supreme Court has stated that "one cannot intend to cause death without necessarily intending to cause physical injury." *State* v. *Murray*, 254 Conn. 472, 483, 757 A.2d 578 (2000). Accordingly, the defendant argues that the charge of attempt to commit assault in the first degree, of which he was acquitted, was a lesser offense included within the charge of attempt to commit murder. Therefore, the defendant argues that the conviction is legally inconsistent with the acquittal and that it must be reversed.

Although we may not consider the evidence presented at trial, we must examine the offenses charged in the information and the judgment rendered by the court to determine whether an inconsistency exists as a matter of law. See *State* v. *Knight*, supra, 266 Conn. 667. In rendering its judgment, the court explained that "[o]n the charge of criminal attempt to commit murder, I find that the identifications . . . by the witnesses, including that of Dago, were very strong and powerful, and the statements of [the defendant] himself, also, were persuasive. On the third [attempt to commit assault in the first degree], fourth and fifth counts, I will simply note that there was insufficient evidence in my judgment to connect [the defendant] to the gun, which was found on [May 29, 2003]."

Upon review of those findings, we conclude that in rendering its judgment on the charged offenses, the court improperly imposed an additional element with respect to the charges of which the defendant was acquitted.[25] Specifically, the court imposed an additional proof requirement on the state to demonstrate that the gun alleged in those counts was the exact .25 caliber handgun that the police recovered one week after the shooting. The use of a handgun of any kind is not an element of the crime of murder. Therefore, as a matter of law, the judgment of conviction rendered by the court on the charge of attempt to commit murder was not inconsistent on its face with the judgment of acquittal on the charge of attempt to commit assault in the first degree.

B

With respect to the claim of a factual inconsistency in the court's judgment, the defendant argues that the judgment of conviction on the charge of attempt to commit murder is factually and logically inconsistent with the judgment of acquittal on the charges of attempt to commit assault in the first degree, carrying a pistol without a permit and criminal possession of a firearm. Specifically, the defendant points out that each of these charged offenses in the information alleged the use or possession of a .25 caliber handgun.[26] The defendant argues that because the court found him guilty of attempt to commit murder involving the use of a .25

---

[25] As discussed in part III B, the court's imposition of this superfluous element served only to benefit the defendant.

[26] The fourth count of the information, which charged the defendant with carrying a pistol without a permit, alleged in relevant part that he "did carry a pistol, to wit: a .25 caliber pistol, upon his person without a permit to carry such pistol being issued to him in violation of § 29-35 of the Connecticut General Statutes." The fifth count of the information, which charged the defendant with criminal possession of a firearm, alleged in relevant part that he "did possess a firearm, to wit: a .25 caliber pistol, and has been convicted of a felony . . . ."

caliber handgun, there is no reasonable explanation for the court's conclusion that he was not guilty of carrying and possessing a .25 caliber pistol during the commission of this offense. The defendant urges us to adopt the view that unlike in jury trials, factually inconsistent findings rendered by a trial court as the sole fact finder are impermissible.

With respect to criminal trials before a jury, "[t]he general rule to which we subscribe is that factual consistency in the verdict is not necessary. Each count in an indictment is regarded as if it [were] a separate indictment. . . . [A] factually inconsistent verdict will not be overturned on appeal. On several occasions, [the Supreme Court] has refused to reverse a verdict of guilty on one count where that verdict appeared to be inconsistent with a verdict of acquittal on another count. . . . The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise. . . . [I]nconsistency of the verdicts is immaterial. . . . As Justice Holmes long ago observed in the case of *Dunn* v. *United States*, 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932): The most that can be said in such cases . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity. . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Citation omitted; internal quotation marks omitted.) *State* v. *Knight*, supra, 266 Conn. 669–70.

With respect to criminal matters tried to a court, there is a split of authority concerning the permissibility

of inconsistent findings rendered by the trial court as the sole trier of fact, and the issue remains unresolved in our courts. See id., 671 n.11. "In [*United States* v. *Maybury*, 274 F.2d 899, 902 (2d Cir. 1960)] the United States Court of Appeals for the Second Circuit reasoned that the rationale for permitting inconsistent verdicts from a jury does not exist in criminal cases before a judge. There is no arbitral element in . . . a trial [to the court]. While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the voice of the country, even when he sits in the jury's place. If he deems an indictment multiplicious, he has only to say so, and the time for him to exercise any lenity that he deems warranted is on sentence. *There is no need to permit inconsistency in the disposition of various counts so that the judge may reach unanimity with himself . . . .*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Knight*, supra, 266 Conn. 671.

As our Supreme Court has stated, "[i]t is clear that, in *Maybury*, the Second Circuit was concerned solely with the situation wherein a trial court, sitting as the sole trier of fact, has undermined the credibility of its own decision by rendering two or more verdicts that are inconsistent with each other. Indeed, the court explained that the reason for reversing an inconsistent verdict by a trial court is not because of any desire for *elegantia juris* but because we can have no confidence in a judgment convicting [the defendant] of one crime when the judge, by his acquittal of another, *appears to have rejected the only evidence that would support the conviction here.*" (Emphasis added; internal quotation marks omitted.) Id., 671–72.

In this opinion, we need not decide whether to extend the rule allowing inconsistent jury verdicts to cases tried solely to the court because even if we were to

apply the law drawing a distinction, we would conclude that this is not a case that demands reversal of the judgment because of a lack of confidence in the trial court's judgment *of conviction* on the charged offense of attempt to commit murder. With respect to the judgment of conviction, the court clearly stated the reasons underlying its decision, and those reasons are amply supported by the record. Rather, this case presents a situation in which the court, for reasons neither explained adequately by the court nor apparent from the record, improperly imposed an additional superfluous element to certain remaining charges in rendering its judgment of acquittal on those charges.[27] Any error, therefore, served only to benefit the defendant, as the result of such error was the judgment of acquittal on several charges for which he should have been convicted and not an unlawful conviction.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[27] All parties to a litigation, including the state, should reasonably expect that if they prove to the court all of the elements of a cause of action or defense, an adjudication should enter in their favor. We do not believe that it is within the power of the trial judge to acquit a defendant on charges that are clearly supported beyond a reasonable doubt by the case presented by the prosecutor. See, e.g., *People* v. *Ellis*, 468 Mich. 25, 28, 658 N.W.2d 142 (2003).