STATE OF CONNECTICUT *v.* GARY ROGERS
(AC 31895)

Gruendel, Beach and Pellegrino, Js.

Argued March 8—officially released May 17, 2011

*Norman Pattis*, with whom, on the brief, was *K. Murray Smith*, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, and *James G. Clark*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, Gary Rogers, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-49 (a) (2), assault in the first degree in violation of General Statutes § 53a-59 (a) (5), and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). The defendant also appeals from the judgment of conviction, rendered after a trial to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217. On appeal, the defendant claims that the court improperly (1) denied his motion to suppress the victim's identification of the defendant, (2) announced his nickname, "G-Bo," to the first group of prospective jurors and (3) sentenced him as a persistent felony offender based on his convictions for unclassified felonies. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 16, 2007, around midnight, the victim, Jamal Glasgow, was riding his bicycle home from a friend's house when he noticed several acquaintances outside a bar on Dixwell Avenue in New Haven. After

a brief conversation, as the victim began to leave on his bicycle, he noticed a man holding a baseball cap in front of his face approaching him. The defendant grabbed the handlebars of the victim's bicycle, hit him in the face with a gun and demanded that he hand over the contents of his pockets. The defendant pulled the victim from his bicycle and forced him toward a corner where three other men were waiting. During the struggle, the defendant's face was revealed, and the victim recognized the defendant as a man he knew through friends as "G-Bo." After a brief struggle, the victim broke free from the defendant's grasp, turned, and ran away. The defendant remained standing there holding the gun that he had used to strike the victim. As the victim ran, he heard someone say, "don't shoot," followed by the noise of the gunshots that struck him in the back. The victim testified that as he lay in the street, he again saw the defendant. The victim was taken to Yale-New Haven Hospital where an examination revealed that he had been shot twice in the back, causing spinal damage and partial paralysis.

The defendant subsequently was charged with attempt to commit robbery in the first degree, assault in the first degree, carrying a pistol or revolver without a permit and criminal possession of a firearm. After a jury trial, he was found guilty of counts one, two and four. Subsequently, he was found guilty of count three by the court. Thereafter, the court found the defendant to be a persistent felony offender and imposed a total effective sentence of forty-five years imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the state adduced insufficient evidence to prove his identity. According to the defendant, the court improperly denied his

motion to suppress the victim's identification of him as the shooter because the evidence was unreliable and manufactured by unnecessarily suggestive photographic array procedures. In response, the state argues that the victim's identification was sufficiently reliable to be admissible. We agree with the state.

Our Supreme Court has held that the question of pretrial identification is a mixed question of law and fact. *State* v. *Marquez*, 291 Conn. 122, 136, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). "We review the [trial] [c]ourt's decision for abuse of discretion, applying clear error review to its underlying factual findings and plenary review to its conclusions drawn from such facts." (Internal quotation marks omitted.) Id. "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . [A]n out-of-court eyewitness identification should be *excluded* on the basis of the procedure used to elicit that identification *only* if the court is convinced that the procedure was so suggestive *and* otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 141–42.

"Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest

error. . . . In determining whether identification procedures violate a defendant's due process rights . . . [t]he *defendant* bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Mitchell*, 127 Conn. App. 526, 533, 16 A.3d 730 (2011).

The following additional facts, adduced at the defendant's suppression hearing, are relevant to the defendant's claim. The victim testified that when police officers initially arrived on the scene, he described the shooter as wearing a white shirt with writing on it, black jeans and a black hat, but he was too frightened to identify his defendant. The victim recognized the shooter as the defendant, G-Bo, whom he knew through mutual friends. That afternoon, Herbert Johnson, a detective with the New Haven police department, met with the victim at the hospital; however, they did not have a conversation at that time because the victim was on pain medication and too frightened to speak with the police. On the day of the shooting, at the hospital, the victim did tell his father, Jonathan McElveen, that he recognized a man named G-Bo as the shooter.

The following day, Johnson learned from Brett Runlett, a detective with the New Haven police department, that the defendant was a suspect in another homicide on Dixwell Avenue. The victim had not yet told the police that he recognized the defendant as the shooter. On August 17 and 20, 2007, Johnson visited the hospital but was unable to speak to the victim. Johnson did speak with the victim's aunt on August 20, 2007, who informed him that the victim had identified the defendant as the shooter. The next day, on August 21, 2007, Johnson returned to the hospital and briefly discussed

the shooting with the victim, who identified the defendant as the shooter, described his clothing, height and weight, and stated that the defendant had a beard and mustache.

On August 22, 2007, Johnson returned with a photo board containing eight photographs, the sixth of which was a photograph of the defendant. Prior to viewing the photo board, the victim signed a form that stated that the photographic array may or may not include the perpetrator. Johnson then showed him the photo board. According to the victim's testimony, he almost immediately pointed out the defendant, known to him as G-Bo, as the shooter and stated that he was 100 percent sure of that identification. The victim stated that he did not initially identify the shooter to the police because he was afraid for himself, as well as his pregnant girlfriend and family.

In ruling on the defendant's motion to suppress the victim's identification, the court, *Alexander, J.*, made the following findings in its February 3, 2010 memorandum of decision.

"The court finds in this case that the law enforcement procedures were not suggestive. The photographic array used by the police in this case contained pictures of individuals who looked substantially similar. . . . The defendant's photograph was not prominently displayed or otherwise highlighted in an impermissible manner. In the court's opinion, the evidence established that the officer administering the identification procedure remained neutral and did nothing to influence the witness in making the identification. . . .

"Even if the identification procedure had been unnecessarily suggestive, the court finds that the identification by [the victim] was nonetheless reliable given the totality of the circumstances. The court finds that the victim had a more than adequate opportunity to view

the defendant at the time of the incident and that he was in extremely close proximity to the defendant during this time. The court further finds that even though the victim only provided a clothing description initially because of his fear of the defendant, he demonstrated a certainty to the officers at the time of the identification at the hospital. . . . Most compelling, however, is the fact that the victim and the defendant were acquainted with each other over the course of several years." (Citations omitted.)

We conclude that the court properly considered all of the factors relevant to determining the overall reliability of the victim's identification. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime, the [witness'] degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Santos*, 104 Conn. App. 599, 619, 935 A.2d 212 (2007), cert. denied, 286 Conn. 901, 943 A.2d 1103, cert. denied, 555 U.S. 851, 129 S. Ct. 109, 172 L. Ed. 2d 87 (2008).

The court determined that the victim had sufficient opportunity to view the defendant at close range when the defendant approached him, both during the attack and again after the shooting. Although the defendant claims that the attack took place in a dimly lit area, the court heard evidence to support the victim's testimony that there was adequate ambient light in the area that allowed him to identify his defendant. The victim also witnessed the defendant, whom he had met previously,

standing over him immediately after the shooting, and gave a description of the shooter that matched the physical appearance of the defendant. After viewing Johnson's photo board and identifying the defendant as the shooter, the victim stated that he was 100 percent certain of his identification.

Because we uphold the court's determination that the victim's identification was reliable on the basis of the totality of the circumstances, the defendant's remaining suggestiveness claim does not provide a basis for overturning the court's decision to deny the defendant's motion to suppress. "To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 832, 817 A.2d 670 (2003).

We conclude, therefore, that the court properly denied the defendant's motion to suppress. The court's determination that the victim's identification of the defendant was inherently reliable was supported by its findings of fact, and the defendant has failed to show that these findings are clearly erroneous.

## II

The defendant also claims that the court violated his right to due process when it improperly announced the defendant's nickname, G-Bo, to the first group of prospective jurors. We disagree.

The following additional facts are relevant to the defendant's claim. On September 16, 2009, during voir dire, the court read to a jury panel a version of the information that identified the defendant by his street name, G-Bo. Four jurors were selected from that jury panel, two of whom served on the final panel. The court held an in-chambers conversation, the outcome

of which was put on the record during the afternoon session: "And for the record all parties are present including [the defendant] and, by agreement of the court, based on our chambers discussion, because contested as part of the evidence is the name G-Bo, the court, in its preliminary instructions to the voir dire panel, as well as its opening instructions to the jury, will not be referring as it is alleged in the actual information to that name.

"However, the court did indicate that counsel would have to renew at the end of the trial before the deliberations that the information needed to be amended completely to remove that name if there was, in fact, an absence in proof that allowed the state to charge that as part of its information. . . .

"So with respect to it, and the court did note that as this jury panel was instructed, it was only mentioned once. It was never referred to again. And I don't believe counsel is claiming any error as a result of that single mention. Is that correct . . . ?" The defendant's attorney responded, "[y]es, that's correct, Your Honor." On September 30, 2009, the parties entered into a stipulation, published to the jury, as follows: "G-Bo is a nickname used by . . . the defendant."

On appeal, the defendant argues that by stating the defendant's nickname to the jury panel, the court established that the defendant was known by a street name that placed him at the scene of the crime. The defendant requests review of his claim under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[1] The defendant's affirmative statement to

[1] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond

the court waived any claim of error, and, therefore, his claim must fail under *Golding*. The court summarized its agreement with counsel to exclude any further mention of the defendant's street name on the record. Counsel for the defendant verbally responded that the defendant would not be claiming any error as to the single mention of his street name. Moreover, that single mention only occurred in the presence of two jurors. Finally, a stipulation was later entered by the parties agreeing that G-Bo was a nickname used by the defendant. We conclude, therefore, that the defendant's claim fails under the third prong of *Golding*. See *State* v. *Kitchens*, 299 Conn. 447, 467, 10 A.3d 942 (2011).

### III

The defendant's final claim is that the court improperly sentenced him as a persistent felony offender pursuant to General Statutes § 53a-40 (f)[2] on the basis of his prior convictions for unclassified felonies. We disagree.

The defendant was convicted of attempt to commit robbery in the first degree, assault in the first degree, carrying a pistol or revolver without a permit and criminal possession of a firearm. The defendant had previously been convicted of larceny in the second degree in violation of General Statutes § 53a-123, a class C felony, and two separate convictions for possession of narcotics in violation of General Statutes § 21a-279 (a), an unclassified felony. On appeal, the defendant argues that the court improperly sentenced him as a persistent felony offender because his two prior convictions for possession of narcotics, an unclassified felony, were

a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[2] General Statutes § 53a-40 (f) provides: "A persistent felony offender is a person who (1) stands convicted of a felony other than a class D felony, and (2) has been, at separate times prior to the commission of the present felony, twice convicted of a felony other than a class D felony."

not contemplated by the legislature as felonies that would make a defendant a persistent felony offender.

We first set forth the applicable standard of review. "[I]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State* v. *Elliott*, 127 Conn. App. 464, 477–78, 14 A.3d 439 (2011).

We conclude that the plain and unambiguous language of the statute clearly delineates class D felonies as being distinct from all other felonies. Section 53a-40 (f) requires that a defendant must be "twice convicted of a felony other than a class D felony." An unclassified felony, therefore, qualifies as "a felony other than a class D felony." General Statutes § 53a-40 (f). Based on the clearly written language of the statute, only class D felonies, which carry a lesser maximum punishment than unclassified felonies, are excluded as predicate felonies for purposes of the statute. The maximum punishment for a first offense of possession of narcotics,

an unclassified felony, is seven years; General Statutes §§ 53a-35a and 21a-279 (a); while the maximum punishment for a class D felony is five years. General Statutes § 53a-35a. In crafting the language of § 53a-40 (f), the legislature specifically chose not to exclude unclassified felonies. We conclude, therefore, that on the basis of the clear and unambiguous text of § 53a-40 (f), the court correctly sentenced the defendant as a persistent felony offender.

The judgment is affirmed.

In this opinion the other judges concurred.