STATE OF CONNECTICUT *v.* MARK W. ST. JOHN
(SC 17189)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued October 17, 2006—officially released May 1, 2007

*David V. DeRosa*, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,*

state's attorney, and *Chris Pelosi*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Mark W. St. John, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the second degree in violation of General Statutes § 53a-135 (a) (2)[1] and kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a).[2] On appeal,[3] the defendant claims that the trial court improperly: (1) admitted dog tracking evidence without conducting a formal hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 59, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); and (2) denied his motion to suppress two pretrial identifications. We disagree, and, accordingly, affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found. On July 16, 2002, between 9 and 9:30 p.m., a masked man burst into the convenience store at a gas station in Manchester, pointed a gun in the face of Musharraf Hussain, the

---

[1] General Statutes § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and . . . (2) in the course of the commission of the crime or of immediate flight therefrom he . . . displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument."

[2] General Statutes § 53a-92a (a) provides in relevant part: "A person is guilty of kidnapping in the first degree with a firearm when he commits kidnapping in the first degree as provided in section 53a-92, and in the commission of said crime he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. . . ."

[3] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

store's owner and operator, and demanded money. The man was wearing a long sleeved black jacket and had a bandage on his hand. After Hussain gave the gunman $300 or $400 dollars from the cash register, the gunman threatened to shoot him. The gunman repeated the threat several times and ordered Hussain to go to the stockroom. After they reached the stockroom, the gunman asked Hussain if the room had a telephone. When Hussain said "no," the gunman shut him inside the room, yelling: "Don't come out. Don't come out . . . ." Hussain stayed inside the stockroom for about one minute before running outdoors. As he came out of the store, he noticed a man near some bushes at the edge of the property and saw the side of his face. The man did not appear to be wearing a shirt or a jacket. He also saw a regular customer, Karen Nowak, standing by one of the pumps, shouting: "Are you okay? Are you okay?"

Nowak had been walking her dog across the street when she suddenly heard loud voices coming from the direction of the gas station. She heard a man yelling: "Don't you even move. Just stay there." Nowak looked over at the brightly lit station and saw a man come out of the convenience store, cross the island between the pumps and head in her direction before angling off to the right. The man had on a black mask, a white shirt and was waving a gun back and forth. As he crossed the island, the man removed the mask, revealing the side of his face. Nowak continued to watch the man as he walked toward a stockade fence, where he appeared to cast something aside before disappearing out of sight.

Nowak immediately went to the gas station and encountered Hussain, who was rushing out of the store and pointing toward the fence, shouting: "There he goes." As Nowak turned to look, a man appeared from behind the fence and walked briskly in the direction

of the Manchester green. At about the same time, the police arrived.

At approximately 9:30 p.m., Trooper John Tollis, a police officer from the canine unit of the Connecticut state police, arrived at the scene with a German shepherd tracking dog named Diesel. Upon his release from the car, Diesel ran directly to the bushes near the edge of the property and pulled out a knit hat.[4] Although Diesel was so excited by the scent from the hat that he started tracking on his own, Tollis called him back so that he could properly prepare the dog. After he harnessed the dog and attached the proper lead, he allowed Diesel to start tracking. Forty to forty-five minutes later, Diesel tracked the scent to a location in a residential neighborhood where the defendant was being detained by the police, ignoring fifteen or twenty other civilians along the way. After reaching the site, Diesel worked his way through several officers until he found and jumped up on the defendant, a signal that he had been trained to give when he discovered the source of the scent.

Meanwhile, approximately forty-five minutes after the robbery, Officer William Young of the Manchester police department drove Nowak to a nearby location to identify a possible suspect. Nowak stayed in the backseat of the vehicle while the officer directed a spotlight at the defendant, who was standing in front of a house. Although Nowak stated that she was not 100 percent certain that the defendant was the robber, she described the defendant as "[v]ery similar" in height, weight, age and build to the man she had seen leaving the gas station, although his hair looked somewhat darker. Nowak explained the discrepancy in color

---

[4] From the evidence presented, the jury reasonably could have inferred that the knit hat described by Tollis was the mask that covered the robber's face.

as possibly due to the brighter light at the station, which caused the man's hair to look shiny.

Less than one hour after the robbery, Officer David Ellsworth of the Manchester police department drove Hussain to the same location. Hussain also remained in the backseat of the vehicle while a spotlight was directed at the defendant, who was standing without a shirt in front of a house. Hussain told the police that he was 100 percent certain that the defendant was the robber. In fact, Hussain recalled seeing the defendant two other times that day. The first time was earlier in the evening when the defendant had come into the convenience store to use the bathroom and to purchase several items. The defendant had told him to keep the change from a $20 bill, which Hussain had refused to do. The second time was three or four minutes before the robbery, when Hussain was looking out the window and had a clear view of the defendant, who was standing near one of the pumps wearing a black jacket and twirling a black mask on his hand. According to Hussain, the defendant's black jacket and black mask were the same as the jacket and mask worn by the robber. Hussain also recognized the defendant as a regular customer who occasionally had come into the store for coffee or cigarettes. Because Hussain had spoken to the defendant in the past, was familiar with his voice and even knew his name, he had no doubt that the person he saw outside of the convenience store just before the robbery was the person who had robbed him.

During their investigation, the police seized the mask, an ace bandage, a black pullover jacket, a blue and white striped shirt and a black handgun, all of which they found behind the bushes near the convenience store. Following the identifications by Nowak, Hussain and Diesel, the defendant formally was taken into custody and charged with robbery in the second degree and kidnapping in the first degree with a firearm. The

trial court rendered judgment of conviction in accordance with the jury's verdict of guilty as to both charges and sentenced the defendant to a total effective sentence of twenty-five years incarceration, execution suspended after seventeen years, with five years probation. This appeal followed.

I

The defendant first claims that the trial court violated his constitutional rights and abused its discretion when it admitted evidence about dog tracking, generally, and about tracking the defendant, in particular, without first conducting a hearing pursuant to *State* v. *Porter*, supra, 241 Conn. 59, to determine the scientific validity of dog tracking evidence, the reliability of the specialized knowledge and techniques used by the dog tracking officer and the officer's qualifications to testify regarding this evidence. We disagree.

The following additional facts are relevant to our resolution of this issue. At trial, the defendant made an oral motion in limine to preclude the state from admitting dog tracking testimony without conducting a *Porter* hearing to establish that dog tracking is a scientifically valid investigative technique. In response, the state offered the testimony of Tollis, outside the presence of the jury, to show that dog tracking evidence is technical rather than scientific in nature and is so well accepted that a *Porter* hearing is unnecessary. Tollis testified as to his understanding of the underlying science and methodology of dog tracking, his training and experience in dog tracking generally, his training and experience with Diesel, Diesel's history of success in tracking suspects and how Diesel had behaved while tracking the defendant in this particular case.

At the conclusion of the testimony, defense counsel acknowledged that dogs had been used to track criminal suspects for many years, even centuries, but argued that

an understanding of the scientific principles underlying dog tracking was relatively new and that no Connecticut court had determined whether the methodology was scientifically reliable. The defendant thus argued that, unless the court conducted a *Porter* hearing to make such a determination, and unless the jury understood the underlying science and methodology of dog tracking, the officer's testimony should not be allowed.

The court ruled that a *Porter* hearing was not required because it is common knowledge that dogs have an outstanding sense of smell and there is nothing novel, experimental or innovative about the practice of using dogs to track criminal suspects. The court also concluded that the dog tracking evidence proffered by the state would be more probative than prejudicial on the issue of the defendant's identity, and that the defendant would have a full and fair opportunity to cross-examine Tollis for the purpose of persuading the jury that dog tracking evidence is unreliable.

The defendant then made an oral motion to preclude the dog tracking testimony on the ground that only an expert witness should be permitted to testify on the subject and that Tollis was not an expert because he had limited knowledge, skill, training and education in dog tracking procedures and methodology. The defendant further contended that, because no uniform standard existed to control and evaluate dog tracking, it should not be allowed under § 7-2 of the Connecticut Code of Evidence.[5] The defendant added that the prejudicial effect of the evidence would greatly outweigh its probative value and that admission of the evidence

[5] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

would violate his constitutional rights, including his right of confrontation.

The court denied the motion on the ground that the disputed testimony was relevant because it related to the primary issue in the case, namely, the identity of the defendant, and, consequently, would assist the trier of fact. The court further concluded that the defendant's constitutional right of confrontation would not be violated because he would have the opportunity to cross-examine the officer. The court finally determined that the testimony would be highly probative, with only minimal prejudicial effect, and permitted him to testify as a witness for the state.

Tollis explained that he and Diesel had participated in a fifteen week program for forty hours per week at the state-operated canine training academy, during which time the dog had been trained to protect his handler and to track human scent. Tollis described the training program in detail, including the fact that dogs are rewarded at the end of a successful track and are required, along with their handlers, to take monthly and annual refresher courses. He added that dogs are especially good at tracking scents because they have a smelling capacity 60 to 100 times greater than that of humans, and that German shepherds often are used for law enforcement purposes because they are loyal, hardworking and eager to please their handlers. Tollis also testified as to Diesel's record in tracking criminal suspects, his own past experience with another tracking dog and the apocrine scent, on which canines thrive, that is given off by the human body when a person is nervous, frightened or excited.

Tollis further testified that tracking experience allows a handler to "read" his dog as it proceeds along the trail. He explained that, when approaching the end of a trail, a dog becomes more aggressive and excited

and pulls more strongly because it knows that it will receive a reward when it locates the source of the scent. In Diesel's case, the rate of success was approximately 70 percent. Tollis added that he performed training exercises with Diesel to maintain his tracking skills on days when the dog did not work.

Tollis then described how Diesel had tracked the defendant from the scent given off by the knit hat at the gas station to the location on Quaker Road where the defendant was being detained. Because he had not worked on another track that day, the dog was fresh, had high energy and was eager and excited to follow the scent. Although Tollis was accompanied by a Manchester police officer who was in radio contact with other officers, Tollis was concentrating on "reading" Diesel's behavior to make sure that the dog was not focusing too much attention on other animal scents or distractions. When Diesel reached an intersection between Elizabeth Drive and Quaker Road, the dog continued ten or fifteen yards up Elizabeth Drive, eliminating foreign scents in the area, before it turned back and proceeded up Quaker Road. Tollis testified that, while Diesel was still on Elizabeth Drive, the Manchester officer who accompanied him told him that a suspect was being detained on Quaker Road. Tollis also stated, however, that Diesel already was heading back in the direction of Quaker Road and was pulling hard when he received this information. Tollis described the dog's change of direction as natural, because a scent trail does not suddenly stop and take a right angle, but can be affected by wind, which may blow the scent in various directions at any point along the way. When Diesel reached 5 Quaker Road, where the defendant was being detained, he stopped tracking, ignored approximately five other police officers who were on the site and jumped on the defendant to signal that he had reached the source of the scent.

On cross-examination, Tollis gave testimony regarding the science of dog tracking on the basis of knowledge he had acquired during his training at the academy. He testified that when a person is in the same area for a certain period of time, a "scent pool" is created. He also explained how the scent pool is affected by time, wind, rain, snow and other inclement weather and how a dog can distinguish between the apocrine scent that is given off by a human during times of stress and a normal human scent. Tollis further testified that exhaust, smoke and the scent of another animal can contaminate or affect the scent trail. He stated that Diesel never had made a false identification.

The applicable standard of review for evidentiary challenges is well established. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *Dinan* v. *Marchand*, 279 Conn. 558, 567, 903 A.2d 201 (2006).

"In [*Porter*], we adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]. We noted therein two requirements established under *Daubert*. First, [we noted] that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . .

Second, [we noted that] the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 215, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

In the present case, the defendant conceded during oral argument in this court that he was no longer challenging the scientific validity or reliability of the dog tracking evidence, but, rather, was claiming that Tollis was not properly qualified as an expert to testify on the subject. We disagree with the defendant that Tollis was unqualified to testify.

In *State* v. *Wilson*, 180 Conn. 481, 488–90, 429 A.2d 931 (1980), we concluded that the testimony of a state trooper describing his work with a bloodhound to track and apprehend a suspected criminal constituted expert testimony and, as such, was admissible to prove the identity of the accused in a criminal prosecution after a proper foundation had been laid. To establish such a foundation, the party offering the evidence must show that: "(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it." (Internal quotation marks omitted.) Id., 489. Moreover, because "the qualification of an expert witness is within the discretion of the trial court . . . its discretion will not be disturbed on appeal unless that discretion is abused . . . ." Id., 489–90.

The defendant claims that the trial court improperly admitted Tollis' testimony because the state did not

satisfy the second and fourth prongs of *Wilson*. With respect to the second prong, the defendant claims that the state did not present sufficient evidence that the dog was trained and accurate in tracking humans because it did not present: (1) scientific or technical evidence that dogs can, in fact, be trained to track scents; (2) testimony from the person who had trained the dog; and (3) a scientific context to determine whether the dog accurately had tracked the defendant or had been influenced instead by subconscious cues from the officer, who was aware of the defendant's location. The second prong of *Wilson*, however, does not require the state to provide scientific or technical evidence demonstrating that dogs can be trained to track scents or can track suspects accurately. It merely requires evidence that the dog was trained and accurate in tracking humans. See id. In this regard, Tollis testified that he and Diesel had participated in a fifteen week program for forty hours per week at the state-operated canine training academy, that Diesel had a success rate of approximately 70 percent and that the dog never had made a false identification. In addition to this testimony, which, standing alone, satisfied the second prong of *Wilson*, Tollis provided context with his testimony regarding the underlying science and methodology of dog tracking and how dogs and their handlers deal with contaminants and distractions in the environment during the tracking process.

Insofar as the defendant attacks the state for failing to present testimony from the trainer, he misses the point made in *Wilson* that the handler is competent to present dog tracking evidence as an expert in the matter, provided that a proper foundation has been established. Id., 488–90. Moreover, the defendant has not alluded to any deficiencies in Tollis' testimony that could have been avoided or remedied had the trainer been called to testify. Finally, Tollis gave detailed testi-

mony regarding Diesel's behavior as he was tracking the defendant, and, therefore, the defendant had ample opportunity to cross-examine him for the purpose of suggesting that he subconsciously had given the dog cues while they were tracking the suspect. Accordingly, the defendant cannot prevail on his claim that the state did not satisfy the second prong of *Wilson*.

The defendant also claims that the fourth prong of *Wilson* was not satisfied because the state did not provide a scientific explanation as to how a dog can continue to track a scent after a trail has been contaminated by automobile exhaust. We reject this claim because the fourth prong of *Wilson* does not require the type of scientific evidence to which the defendant refers. The fourth prong only requires evidence that the trail had not become so stale or contaminated that it was beyond the dog's ability to follow. See id., 489. In the present case, Tollis described not only how dogs generally respond to contaminants and can continue to track scents in environments permeated with automobile exhaust, but that the scent trail he followed with Diesel was fresh, that Diesel was extremely excited and eager to work and that the dog was successful in overcoming distractions during the tracking process. Specifically, Tollis described how the dog had been able to work through the slight disturbance in the scent trail when they reached the intersection of Elizabeth Drive and Quaker Road, ultimately retracing his path and turning onto Quaker Road. Accordingly, we conclude that the fourth prong of *Wilson* was satisfied and, therefore, that the trial court did not abuse its discretion in admitting the dog tracking testimony.[6]

---

[6] The defendant also claims in his initial brief to this court that the trial court improperly charged the jury on the dog tracking evidence. The defendant specifically claims that the court improperly: (1) failed to instruct the jury, as he had requested, to exercise caution in evaluating the dog tracking evidence and that such evidence was of slight probative value; and (2) advised the jury to consider the testimony of Tollis as that of an expert witness. The defendant argues that the improper instructions gave undue

## II

The defendant's next claim is that the court violated his due process rights when it denied his motion to suppress the pretrial identifications made by Nowak and Hussain. The defendant specifically argues that the police used an unnecessarily suggestive show-up procedure that tainted the out-of-court identifications. He claims that the procedure was suggestive because, when the witnesses observed him, he was the only civilian among numerous police officers, and he was restrained by handcuffs, illuminated by a spotlight and not free to leave. This claim has no merit.

On July 29, 2003, the defendant moved to suppress evidence of pretrial identifications by Nowak and Hussain on the ground that they were unnecessarily suggestive and, therefore, unreliable.[7] At the suppression hearing, Nowak testified that, after the police arrived at the gas station and she had given them a statement, an officer approached and told her that a suspect had been detained and that the police wanted to see if she could identify him as the perpetrator. Nowak testified that the officer did not tell her that the suspect was responsible for the robbery or that she had to pick out

emphasis to the qualifications of Tollis as an expert rather than as a fact witness, and allowed the jury to give his testimony undue weight. In response, the state argues that the court should decline to review the defendant's instructional claim because it was inadequately briefed.

In his reply brief, the defendant declares that the jury charge claim was not intended as a freestanding claim of instructional impropriety, but was an argument intended to show that the jury instructions did not mitigate the harm or prejudice that resulted when the court admitted the testimony of an unqualified expert on dog tracking evidence. We accept this characterization of the defendant's claim. Accordingly, we decline to address this argument in light of our conclusion that the trial court properly admitted the dog tracking evidence.

[7] Although the defendant's motion also challenged a pretrial identification by a third witness, we do not address the defendant's arguments relating to the inability of the third witness to identify the defendant at the suppression hearing because the witness did not testify before the jury.

a suspect, but that he merely asked her to look at the suspect for purposes of identification. She also testified that, after the officer drove her to view the suspect, she stayed in the car while the officer directed a light at the defendant and asked if he looked like the person she had seen fleeing from the station. The defendant appeared to be in handcuffs and was standing close to an officer, although the spotlight, for the most part, did not illuminate the officer. Three or four other patrol cars also were in the vicinity.

Officer Young, who drove Nowak to view the defendant, corroborated her testimony. According to Young, he told Nowak that a person matching a description of the robber had been detained and that the police wanted her to look at him to determine whether he might be the perpetrator. Young also explained that the person might or might not have been involved in the robbery and stressed the importance of being 100 percent certain if she thought she could make a positive identification. He also testified that the defendant was standing in front of a residence, with a uniformed officer close by and possibly two other officers in the vicinity, all of whom were wearing firearms, and that he had focused a spotlight on the defendant because it was dark outside. Young further testified that Nowak had told him that the defendant was similar in height, weight and build to the man she had seen fleeing the gas station, but that she could not be 100 percent certain that he was in fact that person.

Hussain also testified that a police officer had driven him in a patrol car to another location to view a suspect. Hussain testified that, upon their arrival, a spotlight was directed at the defendant while Hussain remained in the car. Although Hussain stated that the police had not told him that he had to pick someone out, he was 100 percent certain that the defendant was the robber. Hussain noticed five or six other patrol cars at the site,

but did not recall whether the defendant was hand-cuffed or how many police officers were present.

Officer Ellsworth testified that he had transported Hussain in a patrol car to the defendant's residence, where he was being detained, and had told Hussain that the police had a suspect they would like him to view for purposes of identification. Ellsworth explained that the person might or might not have been involved in the robbery and that the police wanted Hussain to give a positive identification only if he could, because they did not want him to identify someone who might be innocent. Ellsworth stated that, when they arrived, the defendant was standing in front of the house with several armed and uniformed officers nearby because the defendant was not in handcuffs. Although it was dark outside, Ellsworth did not recall whether the defendant had been illuminated by a spotlight. Responding to questions from the court, Ellsworth explained that, when information regarding a potential suspect is developed very quickly following the commission of a crime, the police often do a show-up identification procedure while the face of the perpetrator is still fresh in the victim's mind.

The trial court concluded that, although show-up procedures are inherently suggestive to some extent, the identification procedures followed in this case were not "so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification." The court also concluded that, even if the procedures had been unnecessarily suggestive, the out-of-court identifications were reliable considering all of the circumstances. The court therefore denied the defendant's motion to suppress.

We first set forth the standard of review. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are

obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 547–48, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Previously, we have stated that "[a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 832, 817 A.2d 670 (2003). "We have recognized that generally a one-to-one confrontation between a [witness] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message

to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 247, 710 A.2d 732 (1998). We also have recognized, however, that the existence of exigencies may preclude such a procedure from being unnecessarily suggestive. See id., 248; *State* v. *Wooten*, 227 Conn. 677, 686–87, 631 A.2d 271 (1993). "In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." *State* v. *Holliman*, 214 Conn. 38, 48, 570 A.2d 680 (1990). We also have considered whether the identification procedure provided the victim with an opportunity to identify his assailant while his memory of the incident was still fresh. *State* v. *Wooten*, supra, 686.

In the present case, we conclude that the trial court properly determined that the identification procedure was not unnecessarily suggestive. The court found that the police presence was not overwhelming and that the spotlight did not create an unnecessarily suggestive atmosphere in view of the fact that it was dark outside. The court also found that it was not clear whether the defendant was handcuffed and, in any event, the witnesses knew that they were going to be viewing a likely suspect.[8] Even more significantly, the court found that there was no evidence that the police had suggested to the witnesses that they had to identify the defendant, that the defendant was indeed the person who had committed the crime or that the police had coerced the witnesses in any way. Furthermore, the court found that the police had reason to fear that an armed robber

---

[8] Nowak testified that she thought the defendant was in handcuffs. Hussain, however, did not recall seeing handcuffs and Ellsworth testified that the defendant was not in handcuffs.

was on the loose and to believe that immediate action was necessary. Although the trial court made no findings on the matter, we conclude, given the fact that both witnesses observed the unmasked robber only from the side and back, that it was important for the witnesses to be able to view the defendant as soon as possible while their memories remained fresh. See id., 686–87 (concluding that investigative needs of police and desire to give victim opportunity to identify assailant while memory still fresh sufficient to prevent identification procedure from being unnecessarily suggestive). Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to suppress the pretrial identifications on the ground that the identification procedure was unnecessarily suggestive.

Nevertheless, even if we assume that the procedure was unnecessarily suggestive, we agree with the trial court that the identifications were reliable under the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 553; *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

With respect to Nowak, the trial court found that she had had a good opportunity to view the robber. The gas station was well lit, she was wearing her glasses and it was a clear day. Although she was about 100 feet

away and initially had only a side view of the perpetrator, she was able to see him for a substantial enough period of time to obtain a good look.

The court also found that Nowak had reason to be attentive because she heard loud noises and yelling coming from the direction of the station. Her description of the robber also was generally accurate, the only inconsistency being the color of the robber's hair, which she explained could have been due to the brighter lighting at the gas station. In addition, there were no obstructions and her only distraction was her concern that her dog might bark. She also had a second view of the defendant from approximately sixty to seventy feet away after she went over to the station. Although she was not 100 percent certain that the defendant was the robber, she indicated that the defendant and the robber were similar in appearance. Finally, the court noted that all of the identifications occurred soon after the crime was committed. The court therefore stated that it had no problem concluding that the identification by Nowak was reliable under the circumstances.

With respect to Hussain, the trial court found that, although he was frightened at the time of the robbery and the robber was wearing a mask, a key factor in Hussain's identification was his clear view of the defendant prior to the robbery standing outside the store, twirling a mask. The court also noted that Hussain was 100 percent certain that the defendant was the robber. It therefore determined, after considering all of the evidence, that Hussain's identification was reliable under the totality of the circumstances.

We conclude that the trial court's findings with respect to the pretrial identifications by Nowak and Hussain are supported by the record and that, even if we were to assume that the identification procedures were unnecessarily suggestive, the trial court did not

abuse its discretion in determining that the identifications were reliable under the totality of the circumstances.

The judgment is affirmed.

In this opinion that other justices concurred.