STATE OF CONNECTICUT *v.* PHILIP MITCHELL
(AC 27074)

Bishop, Gruendel and Beach, Js.

Argued February 15—officially released June 10, 2008

*Charles F. Willson*, special public defender, for the appellant (defendant).

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Nicholas J. Bove*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Philip Mitchell, appeals from the judgment of conviction, rendered after a jury trial, of assault in the third degree in violation of General Statutes § 53a-61. On appeal, the defendant claims that the trial court (1) improperly denied his motions to suppress a statement he made to the police prior to being told of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the victim's identification of the defendant, and (2) abused its discretion in refusing to sanction the state

for failing to produce an officer's investigative notes. We reverse the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 4:30 in the morning on August 20, 2004, the victim was driving on Connecticut Avenue in Bridgeport looking to purchase marijuana. She asked two young women for marijuana, and they told her to follow them. The women turned and walked along Fifth Street, and the victim followed and parked her car. The women went across the street and returned with two men, one of whom was the defendant. The defendant told the victim to turn off her car's engine. Once she did so, all four people attacked her by punching her head, hitting her face, pulling her hair and trying to pull her through the car window. The victim screamed, pulled back, honked her car's horn and held onto the steering wheel so that she would not be pulled from the car. The victim testified that the defendant was "right in [her] face" during this attack, told her to "shut the fuck up or I'm going to blow your head off" and acted as though he had a gun. Eventually, the attackers opened the car's passenger door, and the defendant dragged the victim out of her car by the wrists. One of the women took $20 from the victim's pocket while the defendant continued to drag the victim. The victim hooked her foot around a metal fence post and when the defendant let go of her, she stood up. The defendant then kicked her in the stomach and she fell back down. When she got up again, the defendant tried to kick her a second time, but she managed to escape by running away.

The victim ran back to Connecticut Avenue and, seeing a taxicab, explained to the driver that she had just been robbed and asked him to call the police. She also pointed out her attackers as they were getting into a car. The taxicab driver made a U-turn and followed

the car. He also called the police department and reported the license plate number of the car.

State police Trooper Christopher Kick was on duty that morning when he was notified of an assault in Bridgeport and provided with a description of a four door, blue vehicle with the license plate number 254-RPY driving on Interstate 95. Upon seeing the car, Kick followed it until he was joined by two other state police troopers, at which point he stopped the vehicle. All three troopers approached the car with weapons drawn, removed the three occupants from the vehicle, placed them on the ground and handcuffed them.[1]

Meanwhile, the victim was met by Officer Barry Jones of the Bridgeport police department. After she told him about the assault and described the four assailants, she was transported to the site where the suspects had been apprehended. As each suspect was brought in front of the cruiser in which the victim was sitting, she positively identified each as one of the assailants. Subsequently, the victim was taken to the police station where she provided a written statement after which she was taken to a hospital to be treated for her injuries.

The jury found the defendant guilty of assault in the third degree but not guilty of robbery in the second degree, conspiracy to commit larceny in the second degree, unlawful restraint in the first degree and threatening in the second degree. The court imposed a sentence of eight months incarceration.[2] This appeal followed.

---

[1] Though the victim testified that she was attacked by four people, only three suspects were apprehended in the vehicle.

[2] During the sentencing hearing, the defendant's attorney stated that the defendant was then serving an eight year term of incarceration that had been imposed on November 1, 2004. The court imposed the sentence in this matter to run consecutively to the eight year sentence. Accordingly, it appears that the sentence imposed in this matter has not yet expired. Even if the sentence had expired, we note that, "[i]t is well established that since collateral legal disabilities are imposed as a matter of law because of a criminal conviction, a case will not be declared moot even where the sen-

# I

The defendant first claims that the court improperly denied his motions to suppress his pre-*Miranda* statement and the victim's identification of him. We address each claim in turn.

## A

The defendant claims that his pre-*Miranda* statement was the result of a custodial interrogation and should have been excluded from evidence. In addition, he argues that the state cannot demonstrate that the court's error in admitting this statement was harmless because the court highlighted the statement to the jury by giving a consciousness of guilt charge. We agree with the defendant.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. On March 30, 2005, at the pretrial hearing on the defendant's motion to suppress, the state called Trooper Kick to testify. Kick testified that he received word in the early morning hours of August 20, 2004, of an assault that had occurred in Bridgeport and that he had received a description of the alleged perpetrator's vehicle as blue, bearing the license plate number 254-RPY and traveling in the direction of Interstate 95. Kick positioned his vehicle on the highway near the Fairfield rest area, and when he observed a vehicle that matched the description, he drove out to prevent it from exiting the highway. When two other state police cruisers arrived, Kick activated his lights and siren and stopped the car, boxing it in with the police cruisers. The troopers approached the vehicle with guns drawn and ordered the defendant and the other suspects to exit the vehicle and to lie on the ground. The troopers then

tence has been fully served." *Barlow* v. *Lopes*, 201 Conn. 103, 112, 513 A.2d 132 (1986).

searched the suspects for weapons, placed them in handcuffs and separated them. While awaiting the Bridgeport police for a possible identification, Kick testified that he individually questioned the suspects as to where they were going and what they were doing to confirm whether he had stopped the right vehicle and whether the suspects were the individuals who had been involved in the assault. As Kick moved from suspect to suspect, he ensured that a trooper remained with each individual because "[i]f you leave them in handcuffs, they could run." Kick testified that he asked the defendant "if anything had happened that possibl[y] [came] to mind this evening on why you would have been stopped." Kick testified that in response, the defendant "basically came up with nothing. . . . [He] basically replied that he had just taken a ride, he wasn't paying attention, doesn't know where they'd been." Prior to and during this encounter, the suspects were not informed of their rights pursuant to *Miranda*.

After the pretrial hearing, the court issued a memorandum of decision on March 31, 2005, denying the motion to suppress. The court concluded that the state had conceded that the defendant was in police custody while being questioned by Kick. The court found, however, that Kick's questions did not amount to an interrogation, and, therefore, *Miranda* warnings were unnecessary. Accordingly, the court found that the defendant's statements were admissible. The court opined that "Kick's questions, 'What is going on?' [and] 'Why were you stopped?' " were asked at the threshold of the encounter and were arguably aimed at determining the nature of the situation confronting the police at that time. There is no suggestion that Kick's queries were probing, accusatory or likely to elicit an incriminatory response. The court stated: "The fact that Kick asked questions about 'what was going on' without the

intent of eliciting a confession or inculpatory informa-
tion, but simply to investigate the situation before him,
was not an interrogation." (Citations omitted.)

The defendant claims that the court improperly
admitted his statement, as it was the result of a custodial
interrogation, and that the admission of this evidence
was not harmless beyond a reasonable doubt. Because
the court found that the state conceded that the defen-
dant was in custody and that conclusion is supported
by the record, our inquiry is limited to whether there
was an interrogation.[3]

Our Supreme Court has held that "[t]wo threshold
conditions must be satisfied in order to invoke the warn-
ings constitutionally required by *Miranda*: (1) the
defendant must have been in custody; and (2) the defen-
dant must have been subjected to police interrogation."
(Internal quotation marks omitted.) *State v. Atkinson,*

---

[3] On appeal, the state appears not to agree that it conceded the issue of
custody at the pretrial hearing. To the contrary, it argues that the "investiga-
tive detention" of the defendant did not amount to custody, and, therefore,
the police were not required to give *Miranda* warnings before questioning
him. We disagree. Whether the court properly determined that the state had
conceded custody, the predicate facts all support the legal conclusion that
the defendant was in custody when questioned by Kick. The record reveals
that the defendant's vehicle had been stopped and boxed in on the side of
the highway by three police cruisers using sirens and lights, the defendant
was ordered from the vehicle to the ground at gunpoint, handcuffed and
searched, and then separated from the other suspects and paired with a
trooper to prevent him from running away.

On these facts, any reasonable person would have believed that the defen-
dant's freedom of movement was restrained to the degree associated with
a formal arrest. *State v. Britton,* 283 Conn. 598, 604–605, 929 A.2d 312 (2007);
see also *State v. Hasfal,* 106 Conn. App. 199, 206–207, 941 A.2d 387 (2008)
(explaining that while the oft-used "free to leave" test is appropriate for
custody determinations involving a police station, evaluating whether the
restraints amounted to those associated with a formal arrest is more appro-
priate for other settings). See also *State v. Pinder,* 250 Conn. 385, 409–12,
736 A.2d 857 (1999) (although court's function is to determine predicate
facts relative to custody, because ultimate question of whether defendant
is in custody is legal one, review of court's determination regarding custody
is plenary).

235 Conn. 748, 757, 670 A.2d 276 (1996). It is the defendant who bears the burden of proving a custodial interrogation. *State* v. *Doyle*, 104 Conn. App. 4, 11, 931 A.2d 393, cert. denied, 284 Conn. 935, 935 A.2d 152 (2007).

"The trial court's essentially factual determination of whether the police officer's conduct constituted interrogation is reversed only if it is clearly erroneous. . . . When a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence. . . . Nonetheless, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Walters*, 94 Conn. App. 297, 302–303, 891 A.2d 1003, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006), citing *State* v. *Evans*, 203 Conn. 212, 227, 523 A.2d 1306 (1987).[4]

---

[4] Although the ultimate determination of custodial interrogation, as a mixed question of fact and law, is subject to de novo review; *State* v. *Canales*, 281 Conn. 572, 585, 916 A.2d 767 (2007); the trial court has the responsibility to determine the predicate facts regarding custody, and the issue of whether specific questioning constitutes an interrogation is one of fact. Therefore, we assess the facts found by the court relative to custody to determine whether the court's factual findings are clearly erroneous, but we accord plenary review to the court's conclusion as to whether these facts warrant a finding of custody. *State* v. *Pinder*, 250 Conn. 385, 409–12, 736 A.2d 857 (1999); see also *State* v. *Canales*, supra, 584–85; *State* v. *Turner*, 267 Conn. 414, 838 A.2d 947, cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004). As to the issue of interrogation, however, because this is a question of fact, we review the record to determine whether the predicate facts as well as the court's factual conclusion in this regard are clearly erroneous. *State* v. *Evans*, supra, 203 Conn. 227; *State* v. *Walters*, supra, 94 Conn. App. 302–303.

Although there has been some discussion about whether a plenary standard of review should be applicable to the issue of interrogation; see *State* v. *Walters*, supra, 94 Conn. App. 302 n.4 (questioning whether rationale for providing plenary review of custody determinations, as determined in *State* v. *Pinder*, supra, 250 Conn. 409–12, might also apply to determinations of interrogation); we continue to analyze the issue of interrogation under the clearly erroneous standard of review. See *State* v. *Evans*, supra, 203 Conn. 227 (opining that "[s]ince the determination as to whether a particular

"[T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 588, 916 A.2d 767 (2007), quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

"Every question posed to a defendant in custody is not equivalent to an interrogation. . . . Ordinarily, the routine gathering of background, biographical data will not constitute interrogation. . . . Furthermore, questions that are asked after an event or occurrence that would naturally tend to evoke such an inquiry do not constitute interrogation. These questions, unlike the sort of interrogation that prompted the implementation of the *Miranda* safeguards, are characterized by brevity, neutrality and an absence of intent to elicit a confession or admission. Most, moreover, are typically spontaneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Dixon*, 25 Conn. App. 3, 8, 592 A.2d 406 (1991). Even express questioning of the defendant may not constitute interrogation if the questions are normally attendant to arrest and custody and are not reasonably likely to elicit an incriminating

question constituted interrogation is essentially factual, we apply the clearly erroneous standard").

response. *State* v. *Kirby*, 280 Conn. 361, 398–99, 908 A.2d 506 (2006); see also *State* v. *Evans*, supra, 203 Conn. 225–27 (no interrogation when routine booking questions unrelated to crime and objectively neutral).

Here, Kick testified that he questioned each suspect separately and methodically, ensuring that no suspect was ever left without a police officer. He agreed that his intention in questioning the defendant and the other suspects was to "verify that these were or were not the people that were involved in a possible assault." Contrary to the court's recitation of Kick's questions, the record does not support the view that the officer merely asked, "What is going on? Why were you stopped?" at the threshold of the investigation. See, e.g., *Hairston* v. *United States*, 500 A.2d 994, 997 (D.C. App. 1985) (warnings not required when officer, who was greeted at scene by suspect stating that he shot victim, asked, " 'what happened?' "); *People* v. *Quicke*, 71 Cal. 2d 502, 514, 455 P.2d 787, 78 Cal. Rptr. 683 (1969) (no interrogation when officer came upon suspect lying on top of dead body, handcuffed suspect and asked " 'what had happened' "); *State* v. *Dixon*, supra, 25 Conn. App. 9 (no interrogation when suspect attempted to flee officer and upon apprehension was asked, " 'What are you doing here?' "). Instead, here the officer was admittedly seeking an explanation from the defendant for the recent assault. As noted, Kick testified at the pretrial hearing that he asked the defendant "if anything had happened that possibl[y] [came] to mind this evening on why you would have been stopped."[5] This question is much less vague and open-ended than the court's stated version of the question. The court's conclusion that Kick merely asked, "What is going on?" is a palpably more benign question, which an officer might well ask when coming upon a scene and

---

[5] Kick's testimony regarding his questioning of the defendant was undisputed.

attempting to make an initial assessment of the circumstances confronting him or her. In this instance, as noted by Kick, he was not trying to assess the situation at hand; rather, he was attempting to confirm whether he had the right suspects. It is manifest that an officer may not ask a person in custody questions that the officer knows are reasonably likely to elicit an incriminating response. Thus, the court's finding that Kick's questioning did not amount to an interrogation was unsupported by the record and clearly erroneous.

As a consequence, we determine that Kick's questioning of the defendant constituted a custodial interrogation.

Because the defendant's response to the interrogation was not expressly inculpatory, our determination that the defendant was subjected to an improper custodial interrogation would have little consequence unless its admission was harmful. The defendant claims that the admission of his statement was not harmless error because the court compounded the admission by charging the jury on consciousness of guilt. In response, the state argues that the defendant's statement was not facially inculpatory and that any evidence of guilt inferred from it was merely cumulative because the jury could have found the defendant's statement as evidence of consciousness of guilt only if it had already determined that he was guilty. We agree with the defendant.

"The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . In order to assess the harmfulness of the error, the test is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. . . . The harmfulness of an error depends upon its impact on the trier and the result. . . .

[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. [Our Supreme] court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . The proper standard [therefore] is whether any reasonable jury would have found the defendant guilty if the improperly admitted evidence had been excluded." (Citations omitted; internal quotation marks omitted.) *State* v. *Zubrowski*, 101 Conn. App. 379, 385, 921 A.2d 667, cert. granted on other grounds, 283 Conn. 912, 928 A.2d 539 (2007). As this evidentiary impropriety poses a question of constitutional proportion, it is the state's burden to prove that the error was harmless beyond a reasonable doubt. *State* v. *Randolph*, 284 Conn. 328, 377, 933 A.2d 1158 (2007).

Although the defendant's statement that he was just driving around, was not paying attention and did not remember where he had been appears relatively benign, the court's use of it as consciousness of guilt evidence cast the statement in a light unfavorable to the defendant. If our analysis of the statement's impact on the verdict was limited to Kick's testimony, we could have found that the improper admission of this facially innocuous statement was harmless. Given the court's charge, however, that the jury could consider the statement as consciousness of guilt, we conclude that the state has not met its burden of proving that the improper admission was harmless beyond a reasonable doubt.

Over the defendant's objection, the court charged the jury that "it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense, which may fairly have been influenced by the criminal act, that is, that conduct or statements show a consciousness of guilt. . . .

"Whenever a person is on trial for a criminal offense, it is proper to show that person's conduct, as well as any declarations made by him subsequent to the alleged criminal offense which may fairly have been influenced by that act. The manner in which the defendant conducted himself when asked by others, in respect to the subject of this case, may be shown. If he should make false statements as to his whereabouts at the time of the offense, these might tend to show a guilty connection by the defendant with the crime charged." Our review of the record reveals that the defendant's response to Kick's questioning was the only statement in evidence to which the court's charge could apply.

The state argues that the court's charge was harmless because it was merely cumulative. More specifically, the state claims that the court's charge could not have affected the jury's verdict because, for the jury to use the statement against the defendant, the jurors had to already believe that the defendant was involved in the crime. This argument is disingenuous. Although the charging conference took place off the record, it is apparent from the defendant's objection that the state asked the court to give a consciousness of guilt charge.[6] The fact that the state actively sought this charge undermines its argument on appeal that the charge has no bearing on the issue of harm. To have construed the defendant's statement as consciousness of guilt, the jury needed to first conclude, merely, that his statement as to his whereabouts was false. The jury did not, as

---

[6] After the jury was charged, counsel for the defendant took exception to the consciousness of guilt charge. Counsel stated, "I know we had some discussions outside of the presence of the court, off the record, and I'd like to bring back up one of my—one of our discussions, and one of those was specifically the consciousness of guilt charge that the state had presented. . . . I had objected to that, both the inclusion of that, as well as flight. I had objected, and I believe Your Honor had made a decision on it in chambers. I would just ask . . . that that be put on the record."

the state argued, need to first conclude that the defendant was criminally liable. Subscribing to the state's argument in this regard would render a consciousness of guilt charge meaningless.

Although the court did not specifically reference any evidence in conjunction with the consciousness of guilt charge on false statements, the defendant's statement is the only statement in the record to which the charge could apply. As a result, the court's charge not only accentuated the improperly admitted statement, but it also pointed to the defendant's potential involvement. This emphasis makes it impossible for us to conclude that the improper admission was harmless beyond a reasonable doubt.

Finally, the state did not claim that the evidence was so overwhelming that the court's jury charge on consciousness of guilt was harmless. As the state has failed to establish harmless error beyond a reasonable doubt, we reverse the defendant's conviction of assault in the third degree.

B

Our conclusion that this judgment must be reversed leads us to discuss claims that are likely to recur on retrial. See *Allison* v. *Manetta*, 284 Conn. 389, 402, 933 A.2d 1197 (2007). The defendant next claims that the court should have granted his motion to suppress the identification made by the victim. The defendant specifically argues that the show-up was unnecessarily suggestive and that there were no exigencies to justify observation of him in handcuffs, under a spotlight and posing as if he was being booked. The defendant claims, therefore, that the identification was unreliable and should not have been admitted.

The defendant moved to suppress the victim's identification on March 30, 2005. At the pretrial hearing on

the motion, both the victim and Jones testified.[7] The victim testified that during the show-up, the police informed her that a vehicle fitting her description had been stopped and that the suspects were being detained for her identification. When she arrived, each suspect was led individually into the spotlight of the cruiser where she was sitting. The victim testified that when she identified the defendant, she had no doubt that he was one of the people who had attacked her.

Jones, who drove the victim to identify the suspects, corroborated the victim's testimony. He testified that he told the victim that the police had detained the suspects and that they were being held until she identified them. After taking the victim to the highway, Jones testified that each handcuffed suspect was escorted out individually by an officer and shown to the victim from the front and side. Jones testified that he did not take any notes during the identification in part because the victim identified each suspect as one of the people who had attacked her.

At the conclusion of the pretrial hearing on the motion to suppress identification, the court denied the motion, finding that the identification of the defendant by the witness was sufficiently reliable to be admitted.[8] While acknowledging that show-ups are inherently and significantly suggestive, the court determined that the one-to-one identification procedure in this case did not result in a substantial likelihood of misidentification.

---

[7] The victim's testimony about the incident and the statements the defendant made to her during the assault are essentially identical to her testimony at trial. Therefore, we will not repeat it here.

[8] Although the record contains neither a memorandum of decision nor a signed transcript of the court's ruling; see Practice Book § 64-1; we note that the appendix to the defendant's brief contains an unsigned transcript of the court's denial of the motion to suppress the identification. Because that transcript contains a sufficiently detailed and concise statement of the court's findings, we conclude that the record is adequate for our review. See *Carrasquillo* v. *Carlson*, 90 Conn. App. 705, 708 n.2, 880 A.2d 904 (2005).

Consequently, defense counsel made a motion for articulation as to which factors of reliability sustained the court's decision. The court responded that in looking at the totality of the circumstances, factors such as "[t]he timing of the identification, the victim's opportunity to view the defendant, the vehicle identification [and] her certainty in her testimony suggest that her identification was reliable."

First, we set forth the standard of review. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . .

"Previously, we have stated that [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . We have recognized that generally a one-to-one confrontation between a [witness] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty. . . . We also have recognized, however, that the existence of exigencies may preclude such a procedure from being unnecessarily suggestive. . . . In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail. . . . We also have considered whether the identification procedure provided the victim with an opportunity to identify his assailant while his memory of the incident was still fresh." (Citations omitted; internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 276–78, 919 A.2d 452 (2007).

We conclude that the court properly admitted the identification. The facts of this case strongly resemble those in *State* v. *St. John*, supra, 282 Conn. 260. In *St. John*, the defendant appeared individually, was handcuffed, was accompanied by officers and five or six police cars and was illuminated by a spotlight. Id., 275. Our Supreme Court concluded that the spotlight was necessary because it was still dark at the time of the show-up, the police presence was not overwhelming, there was no evidence that the police told the witnesses that the suspect was in fact the person who committed the crime, immediate action was necessary given the violent nature of the crime, and it was important for the witnesses to observe the defendant while their memories were still fresh. Id., 278–79. The same analysis

is applicable here. In this case, because the show-up occurred while it was still dark, the spotlight was appropriate, there was no greater police presence than in *St. John*, the crime involved an unprovoked violent attack for which the police were justified in taking immediate action, and the witness, who was in close proximity to the defendant during the assault, was injured and needed medical treatment, making it reasonable that she identify the suspects without delay.

Even if we were to accept the defendant's claim that the show-up was unnecessarily suggestive, we still would agree with the court's conclusion that the identification was reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 553, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). Thus, the court found that the timing of the identification, the opportunity the victim had to see the defendant during the attack, her description of the vehicle and her certainty in identifying him, when taken in totality, rendered the identification reliable. We agree and conclude that the denial of the motion to suppress was sufficiently grounded in the record and that the court did not abuse its discretion in determining that the identification was reliable.

## II

Finally, the defendant claims that the court abused its discretion by declining to sanction the state for Jones'

failure to produce field notes he took during his initial investigation. Specifically, the defendant argues that the court should have precluded Jones' testimony or, in the alternative, charged the jury to draw a negative inference against the state. As we conclude that the state was not required to provide the defendant with Jones' notes, the court properly declined to sanction the state.

The following additional facts are relevant to the defendant's claim. During the pretrial hearing on the motion to suppress the identification, Jones stated that he took notes, including a brief description of the suspects, during his initial interview with the defendant. Jones explained that he did not bring the notes to court, but he believed he still had them. He stated that the police report incorporated all of his notes regarding the victim's description of the suspects.

After Jones' testimony, the defendant moved orally for a copy of the notes. The state responded that it had never heard of the notes and had never received a motion requesting them. The court took a recess for Jones to obtain his notes. He stated, however, that he was unable to find them and believed they might be at his home. After being instructed by the court to look for the notes at his home, Jones returned and reported that he was unable to locate them. Finally, he testified that although the police report contained information that was not in his notes, everything in his notes was captured by the report.

In reply to the defendant's request for sanctions, the court stated that it did not find any wrongdoing on the part of the state and left it expressly to the defendant to raise the issue of remedies in the future as appropriate. At trial, the defendant was permitted to cross-examine Jones about the notes and their disappearance. The defendant moved to strike Jones' testimony about the victim's description of the defendant and asked for

a jury charge against the state. The court denied the motion and the requested charge. Furthermore, the court observed that the notes did not qualify as statements under Practice Book §§ 40-14 and 40-15 and therefore did not appear to be discoverable by right.

The heart of the defendant's argument is that the notes were discoverable. Practice Book § 40-11 enumerates the information and materials that are discoverable by a defendant as of right.[9] There is no evidence that

---

[9] Practice Book § 40-11 provides: "(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:

"(1) Exculpatory information or materials;

"(2) Any books, tangible objects, papers, photographs, or documents within the possession, custody or control of any governmental agency, which the prosecuting authority intends to offer in evidence in chief at trial or which are material to the preparation of the defense or which were obtained from or purportedly belong to the defendant;

"(3) Copies of the defendant's prior criminal record, if any, which are within the possession, custody, or control of the prosecuting authority, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority;

"(4) Any reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial;

"(5) Any warrant executed for the arrest of the defendant for the offense charged, and any search and seizure warrants issued in connection with the investigation of the offense charged;

"(6) (i) Any written, recorded or oral statements made by the defendant or a codefendant, before or after arrest to any law enforcement officer or to a person acting under the direction of or in cooperation with a law enforcement officer concerning the offense charged; or

"(ii) Any relevant statements of coconspirators which the prosecuting authority intends to offer in evidence at any trial or hearing.

"(b) In addition to the foregoing, the defendant shall be entitled to disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

the notes were exculpatory; therefore Practice Book § 40-11 (a) (1) does not apply. Arguably, the notes fall under Practice Book § 40-11 (a) (6) (i), which requires the prosecution to disclose "[a]ny written, recorded or oral statements made by the defendant or a codefendant, before or after arrest to any law enforcement officer or to a person acting under the direction of or in cooperation with a law enforcement officer concerning the offense charged . . . ." Practice Book § 40-15 defines a statement as either "(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

"[A] police officer's interview notes may be subject to disclosure for use by the defendant in cross-examining the witness, if the officer's notes meet either of [Practice Book] § 749's [now Practice Book § 40-15's] alternate definitions of a statement. The notes may also be discoverable following the officer's own testimony if they are signed or otherwise adopted." (Internal quotation marks omitted.) *State* v. *Belle*, 215 Conn. 257, 266, 576 A.2d 139 (1990); see also *State* v. *Reddick*, 36 Conn. App. 774, 784 n.7, 654 A.2d 761 ("field notes are not statements unless they are signed or otherwise adopted"), cert. denied, 232 Conn. 922, 656 A.2d 671 (1995). In this case, there is no evidence that Jones' notes were signed or otherwise adopted by Jones or the victim. Jones testified that the police report reflected his notes in their entirety. The state was unaware of the notes prior to trial, and Jones made a good faith effort to find the notes upon the court's request. On the basis of the record, we conclude that the court did not abuse its discretion in declining to

sanction the state for the missing notes or in not giving the jury a supplemental charge regarding the notes.

The judgment is reversed and the case is remanded for a new trial in accordance with law.

In this opinion the other judges concurred.